**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE:<br><br>ALUMAX INC.<br><br>      Debtor. | CASE NO. 24-05312-MAG<br><br>Chapter 11<br><br><br>FILED & ENTERED ON 10/09/2025 |

**OPINION AND ORDER**

Alumax Inc. ("Debtor") filed a petition for relief under Chapter 11 of the Bankruptcy Code, on December 6, 2024. (Dkt. # 1.) Pending before the court is an Objection to Proof of Claim # 2-2 ("Objection to Proof of Claim") filed by Debtor (Dkt. # 117); Commercial Equipment Finance, Inc. ("CEFI")'s Reply to Objection to Proof of Claim No. 2-2 (Dkt. # 131); CEFI's Supplemental Legal Brief in Support of CEFI's Replies to Debtor's Objection to Claim #2 and to Debtor's Objection to Amended Proof of Claim (Dkt. # 171); Debtor's Brief in Response to CEFI's Supplemental Brief Regarding Objection to Proof of Claim #2-2 (Dkt. # 175); and CEFI's Sur-reply to Debtor's Response to CEFI's Supplemental Brief Regarding Objection to Proof of Claim #2-2) (Dkt. #182).[1]

For the reasons stated below, Debtor's objection to Proof of Claim #2-2 is denied.

---

[1] Based on the prior related motions, the court understands that the motion at Dkt. # 182 is a reply, rather than a sur-reply. Therefore, the leave to file the motion at Dkt. # 182 was granted under L.Cv.R. 7(c).

## I. JURISDICTION

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), L. Civ. R. 83K(a), and the General Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of Puerto Rico, dated July 19, 1984 (Torruella, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS AND PROCEDURAL BACKGROUND

On December 6, 2024, Debtor filed the instant petition for relief under Chapter 11 of the Bankruptcy Code. (Dkt. # 1). On the same date, Debtor filed its Schedules and Statement of Affairs (Dkt. # 1). Debtor included CEFI in Schedule D as a creditor secured with two (2) units of 2021 Ford Transit Connect vehicles and four (4) units of Isuzu 2021 NPR-XD vehicles. (Dkt. # 1, p. 15). Debtor also included CEFI in Schedule E/F as a nonpriority unsecured creditor.

On January 2, 2025, CEFI filed a secured Proof of Claim ("POC # 2-1") in the amount of $25,516.75, with pre-petition arrears in the amount of $5,920.15, for Loan #2901278-CL4 ("Loan CL4"). (Claims Register # 2-1).[2] Such claim arises from a Master Lease Agreement ("Master Lease Agreement") signed by Debtor on September 1, 2020, pursuant to which CEFI and Debtor (the "Parties") signed Schedule # 2901278-CL4, on April 30, 2021, that became part of and subject to the Master Lease Agreement. (Claims Register # 2-1, p. 7, 9). CEFI accompanied POC # 2-1 with a UCC Financing Statement filed electronically in the Puerto Rico State Department on March 10, 2021, and a Cross-Collateral and Cross-Default Agreement ("Cross Collateral Agreement") signed by Debtor and CEFI for Loan CL4, on April 30, 2021.

On March 11, 2025, Debtor filed an Objection to Proof of Claim # 2. (Dkt. # 50). Debtor objected to Claim No. 2 to the extent that it asserted secured status because the collateral

---

[2] CEFI filed three other proofs of claim which were not objected to by Debtor for loans CL3, L4 and L5.

described in the UCC Financing Statement filed on March 10, 2021, does not match the equipment identified in Schedule # 2901278-CL4, on which Claim No. 2 is based. (Dkt. # 50, p. 3). Debtor alleged that the discrepancy in the description of the collateral renders CEFI's security interest under Loan CL4 unenforceable against Debtor pursuant to Puerto Rico property law. Debtor also argued that CEFI's failure to amend the UCC Financing Statement filed on March 10, 2021, to add additional collateral or to file a UCC Financing Statement in connection to the Cross Collateral Agreement signed for Loan CL4, to give proper notice of any additional collateral, renders the Cross Collateral Agreement ineffective against Debtor or third parties. (Dkt. # 50, p. 3-4). Lastly, Debtor alleged that the discrepancy between the description of the collateral undermines the prima facie validity of CEFI's Claim No. 2. (Dkt. # 50, p. 5). Therefore, Debtor requested that Claim No. 2 be disallowed as secured or be allowed only as a general unsecured claim in the amount of $23,516.75.

On April 21, 2025, CEFI filed an amended Proof of Claim # 2 ("POC # 2-2"). (Claims Register #2-2). CEFI amended Claim No. 2 to file additional security agreements, UCC Financing Statements and Cross Collateral Agreements signed by the Parties under the Master Lease Agreement for Loans CL1, CL2, CL3, and for Loans L4 and L5.

On May 2, 2025, CEFI filed a Reply to Debtor's Objection to Claim #2. (Dkt. # 95). CEFI did not dispute that the description of the collateral in the UCC Financing Statement filed on March 10, 2021, does not match the equipment identified in Schedule # 2901278-CL4, eventually delivered to Debtor. However, CEFI argued that Claim No. 2 should remain a secured claim based on the terms and conditions of the six Cross Collateral Agreements signed by the Parties and the existence of other validly perfected security interest over other collateral whose value is greater than $23,516.75. (Dkt. # 95, pp. 3-4). CEFI added that Section 2234(a) of the

Puerto Rico Commercial Transactions Act, which asserts that a security interest may extend to property acquired after the creation of such security interest, serves to support the jurisprudence confirming the validity of cross collateral agreements in the jurisdiction of Puerto Rico, and CEFI's contention that POC#2-2 is a secured claim. (Dkt. # 95, p. 7). Additionally, CEFI argued that Debtor should be precluded from attempting to avoid its own obligations under the Cross Collateral Agreements under the doctrine of promissory estoppel. (Dkt. # 95, p. 8). CEFI added that the discrepancy between the collateral described in the UCC Financing Statement filed on March 10, 2021, and Schedule # 2901278-CL4, resulted from Debtor's request for a different equipment. CEFI argued that pursuant to the doctrine of one's own acts Debtor cannot argue that POC #2-2 is unsecured when Debtor itself is responsible for the discrepancy in the collateral's description. Lastly, CEFI argued that under the terms of the UCC Financing Statement, the power generator described in Schedule # 2901278-CL4 duly substituted the Chicago Rivett Model described in the UCC Financing Statement filed on March 10, 2021, as the collateral for Loan CL4. (Dkt. # 95, p. 9).

On May 6, 2025, the court entered an order denying the objection to Claim No. 2, as moot, upon CEFI's amended Claim No. 2, filed on April 21, 2025. (Dkt. # 99).

On June 18, 2025, Debtor filed an Objection to Proof of Claim #2-2, where it addressed the Amended Proof of Claim #2-2 and the arguments raised in CEFI's Reply to the Objection to Proof of Claim #2. (Dkt. # 117). Debtor again requested that CEFI's amended Claim No. 2 be disallowed or alternatively reclassified as a general unsecured claim due to the discrepancy in the collateral descriptions included in the Schedule and the UCC Financing Statement signed for Loan CL4. Debtor alleged that the encumbrance perfected for Loan CL4 was not the one agreed upon by the Parties because the UCC Financing Statement does not reasonably identify the

4

collateral described in Schedule # 2901278-CL4, as required. Debtor contended that the Cross

Collateral agreements are not enforceable against third parties because they were not filed in the

Puerto Rico Department of State, nor where the UCC Financing Statements amended to add

collateral to secure Loan CL4. (Dkt. # 117, p. 4). Debtor also argued that the existence of

separate UCC Financing Statements for each loan establishes that CEFI treated them as

"separate, non-cross-collateralized obligations". (Dkt. # 117, p. 6). Further, Debtor alleged that

CEFI misapplied § 2234 of the Commercial Transactions Act, because the possibility of

establishing security interest over after-acquired property does not eliminate the requirement of

perfection. (Dkt. # 117, p. 6). Therefore, Debtor argued that even if they had requested a change

in the collateral that secured Loan CL4, CEFI had the legal obligation to file an amended UCC

Financing Statement in the Puerto Rico State Department to reflect a change in the collateral.

(Dkt. # 117, p. 7).

On July 30, 2025, the court held a hearing on various matters including Debtor's

Objection to Claim No. 2-2. At that time the court ordered CEFI to file a supplemental brief and

Debtor to respond to the same. (Dkt. # 169).

As ordered by the court, on August 13, 2025, the Supplemental Legal Brief in Support of

CEFI's Replies to Debtor's Objection to Claim #2 and to Debtor's Objection to Amended Proof

of Claim ("CEFI's Supplemental Brief") was filed. (Dkt. # 171).

On August 22, 2025, Debtor filed a Brief in Response to CEFI's Supplemental Brief

Regarding Objection to Proof of Claim #2-2. (Dkt. # 175). Debtor reiterated that amended Claim

No. 2 must be disallowed or reclassified as general unsecured because the fundamental problems

identified in the objection to Claim No. 2 remain unchanged, notwithstanding the arguments

presented by CEFI in its Supplemental Brief.

Following the corresponding leave by the court, on August 29, 2025, CEFI filed Sur-Reply to Debtor's Response to CEFI's Supplemental Brief Regarding Objection to Proof of Claim #2-2. (Dkt. # 182).

## III. POSITIONS OF THE PARTIES

### A. Debtor

Debtor argued that: 1) CEFI's Claim No. 2 should be disallowed or only allowed as a general unsecured claim because the collateral described in the UCC Financing Statement filed on March 10, 2021 does not match the equipment described in Schedule # 2901278-CL4, and therefore does not comply with the requirements for the perfection of security under the Puerto Rico Commercial Transactions Act; 2) CEFI's failure to amend the UCC Financing Statement filed on March 10, 2021 to add additional collateral or file a UCC Financing Statement in connection to the Cross Collateral Agreements, renders the Cross Collateral Agreements ineffective against Debtor and third parties; and 3) CEFI's failure to register the Cross Collateral Agreements in the Puerto Rico Department of State renders Claim No. 2 as unsecured since any attachment to additional collateral lacks publicity and is unenforceable against third parties.

### B. CEFI

CEFI argued that: 1) Notwithstanding the discrepancy between the collateral described in the UCC Financing Statement filed in the Puerto Rico State Department on March 10, 2021 and Schedule # 2901278-CL4 as part of the Master Lease Agreement, Claim No. 2 should be considered a secured claim by virtue of the Cross Collateral Agreements signed by the Parties, with the security consisting of the equipment financed through two (2) prior lease schedules that were paid in full pre-petition, yet are part of the Master Lease agreement, and which security remains in effect until the year 2030.

6

## IV. LEGAL ISSUES

(i)     Whether the discrepancy in collateral descriptions between the security agreement for Loan CL4 and the UCC Financing Statement related to Loan CL4 renders Claim No. 2 as unsecured.

(ii)    Whether Loan CL4 is secured by the collateral described in two (2) prior lease schedules acquired under the Master Lease Agreement and which were fully paid, pursuant to the terms of the Cross Collateral Agreements signed by the Parties.

(iii)   Whether the Cross Collateral Agreements had to be registered in the Puerto Rico Department of State to be enforceable against Debtor and third parties.

## V. APPLICABLE LAW AND ANALYSIS

**(i) Whether the discrepancy in collateral descriptions between the security agreement for Loan CL4 and the UCC Financing Statement related to Loan CL4 renders Claim No. 2 as unsecured.**

As stated by the United States Supreme Court and reiterated by the First Circuit Court of Appeals, "debtor's interest in property is defined by state law." Hundley v. Marsh (In re Hundley), 603 F.3d 95, 97 (1st Cir. 2010); see also Butner v. United States, 440 U.S. 48, 54-55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979). The First Circuit has also held that "creditors' rights in bankruptcy arise from the underlying substantive law creating the debtor's obligation." Banco Santander P.R. v. P.R. Hosp. Supply, Inc. (In re P.R. Hosp. Supply, Inc.), 617 B.R. 181, 195 (Bankr. D.P.R. 2020). Therefore, we must look to Puerto Rico's Secured Commercial Transactions Act to determine if Debtor's assets secure CEFI's interests, especially regarding the loan contemplated in Claim No. 2.

The Puerto Rico Commercial Transactions Act contains a modified version of Article 9 of the Uniform Commercial Code, which governs secured transactions in general. Prestige Capital Corp. v. Pipeliners of P.R., Inc., 2011 U.S. Dist. LEXIS 118964, at *15-16 (D.P.R. Oct. 14, 2011). "Generally, if the secured party wishes to perfect his interest in the collateral, it must

7

file a financing statement with the Puerto Rico Secretary of State. Id. See also, P.R. Laws. Ann.

tit. 19, § 2102(1); Angulo-Mestas v. Editorial Televisa Intern., S.A., 747 F. Supp. 2d 255, 258-59

(D.P.R. 2010).

However, it has been stated that a financing statement is intended merely to put third

parties on notice that the filing secured party may have a perfected security interest in the

collateral described. Xynergy Healthcare Capital II LLC v. Municipality of San Juan, 516 F.

Supp. 3d 137, 155-56 (D.P.R. 2021); In re Cushman Bakery, 526 F.2d 23, 29 (1st Cir. 1975)

(citations omitted); In Re Numeric Corp., 485 F.2d 1328, 1331-32 (1st Cir. 1973) ("the function

of a financing statement is merely to put third parties on notice that the secured party who has

filed it may have a perfected security interest in the collateral described."). The financing

statement "was not designed to create a security interest but to perfect the interest already

attached." In re Florida Bay Trading Co., 177 B.R. 374, 382 (Bankr. M.D. Fla. 1994). As such,

the security interest derives from the security agreement, which includes the collateral defined in

the Master Lease Agreement (or its Schedule), and not from the financing statement. Xynergy

Healthcare Capital II, 516 F. Supp., at 155-56.

Section 2218 of the Puerto Rico Commercial Transactions Act states in its pertinent

portion the following regarding the description of collateral included in a financing statement:

> (a) Sufficiency of description. – Except as otherwise provided in subsections (c), (d), and (e) of this section, a description of personal property is sufficient, whether or not it is specific, if it reasonably identifies what is described.
> (b) Examples of reasonable identification. – Except as otherwise provided in subsection (d) of this section, a description of collateral reasonably identifies the collateral if it identifies the collateral by:
>
> (1) Specific listing;
> (2) category;
> (3) except as otherwise provided in subsection (e) of this section, a type of collateral defined in the Commercial Transactions Act;

8

(4) quantity;

(5) computational or allocational formula or procedure, or

(6) except as otherwise provided in subsection (c) of this section, any other method, if the identity of the collateral is objectively determinable.

P.R. Laws. Ann. tit. 19, § 2218.

Having stated the pertinent legal dispositions, we must now compare the collateral described in the Schedule with the equipment included in the UCC Financing Statement related to Loan CL4 to determine if said loan is secured by the collateral described therein.

The UCC Financing Statement filed in the Puerto Rico State Department on March 10, 2021, for Loan CL4, identified CEFI as the secured party and included the following description of the collateral securing CEFI's interests:

> 2021 (NEW) CHICAGO RIVET MODEL 173 FOUR HEAD MACHINE AIR OPERATED (SN: TBD) and all present and future attachments, accessories, replacement parts, repairs and additions or substitutions.

(Claims Register # 2-2, p. 8).

However, on April 30, 2021 (approximately one month following the filing of the UCC Financing Statement) CEFI and Debtor signed Schedule No. 290-1278-CL4, which describes the following equipment as the collateral for Loan CL4:

> 2021 (NEW) SDMO R110, 12KVA, 100KW, ENGINE: 4045HFS87- SN CD4045L309512, ALTERNATOR: KOHLER - SN 343826, 120/208 Volts, Power 0.8, RPM 1800, Phase 3, 60 Hz, Step Size Control, Sound/Weather Enclosure Level II, 200 gallons fuel tank system" (the "SDMO Generator").

(Claims Register # 2-2, p. 9).

The undisputed discrepancy between the collaterals described in the Schedule for Loan CL4 and the UCC Financing Statement filed in the Puerto Rico State Department on March 10, 2020, renders the UCC Financing Statement inefficient and lacking in compliance with the

dispositions of the Puerto Rico Commercial Transactions Act. Therefore, the equipment

described in the UCC Financing Statement cannot serve as collateral for Loan CL4.

**(ii) Whether Loan CL4 is secured by the collateral described in two (2) prior lease schedules acquired under the Master Lease Agreement and which were fully paid, pursuant to the terms of the Cross Collateral Agreements signed by the Parties.**

Art. 1077 of the Puerto Rico Civil Code states that "[i]f the terms of a contract are clear

and leave no doubt as to the intentions of the contracting parties, the literal sense of its

stipulations shall be observed." P.R. Laws. Ann. tit. 31 § 3471. As such, we must evaluate the

Master Lease Agreement, its Schedules and the Cross Collateral Agreements signed by the

Parties.

The Master Lease Agreement signed by the Parties on September 1, 2020, and which

serves as the main loan agreement for the Schedules signed thereafter, states the following:

> Each of the Schedules is a separate lease distinct and separable from each of the other Schedules. The equipment leased under any Schedule shall be referred to herein as "Equipment". The term "Equipment" under each Schedule shall also include all accessories, accessions, attachments, proceeds, replacements and repairs to such Equipment.

(Dkt. # 95, Exh. 3, p. 1)

Equipment is further described in the Master Lease Agreement as "the Equipment

described on all Schedules executed pursuant to this Master Lease Agreement." (Dkt. # 95, Exh.

3, p. 11).

Following the signing of the Master Lease Agreement, the parties signed Schedules for

each of the following loans: Loan CL1, Loan CL2, Loan CL3 and Loan CL4. The parties also

registered UCC Financing Statements in the Puerto Rico Department of State to perfect the

security interest for the collateral identified in every Schedule.

10

As with all the other loans entered with CEFI, upon the signing of the Schedule for Loan CL4, Debtor signed a Cross Collateral Agreement, on April 30, 2021. The Cross Collateral Agreement states in the pertinent part the following:

> All presently existing and hereafter acquired Collateral in which you have or shall have a security interest shall secure the payment and performance of all of our liabilities and obligations to you of every kind and character, whether joint or several, direct or indirect, absolute or contingent, due or to become due, and whether under presently existing or hereafter created Accounts or agreements, or otherwise.

> We further agree that your security interest in the property covered by any Account now held or hereafter acquired by you shall not be terminated in whole or in part until and unless all indebtedness of every kind, due or to become due, owed by us to you is fully paid and satisfied and the terms of every Account have been fully performed by us. It is further agreed that you are to retain your security interest in all property covered by all Accounts held or acquired by you, as security for payment and performance under each such Account, notwithstanding the fact that one or more of such Accounts may become fully paid.

> This instrument is intended to create cross-default and cross-security between and among all the within described Accounts now owned or hereafter acquired by you.

(Claims Register # 2-1, p. 5) (emphasis ours).

The Cross Collateral Agreement, as it reads above, provides that all acquired collateral in which CEFI has or shall have a security interest shall secure the payment and performance of all of Debtor's liabilities and obligations to CEFI of every kind and character. Thus, equipment acquired by Debtor under any of the Schedules of the Master Lease Agreement for which a valid UCC financing statement was filed with the Puerto Rico Department of State secures the payment and performance of all accounts "notwithstanding the fact that one or more of such Accounts may become fully paid" as stated above. All the equipment properly identified as collateral in any of the registered UCC Financing Statements related to the loans subscribed

11

under the Master Lease Agreement will serve as security for any of the other loans entered by

Debtor pursuant to any of the corresponding Schedules.

The following table shows that the collateral described in the UCC Financing Statements

registered to identify the collateral that secured the Schedules of the Master Lease Agreement

consists of equipment related to Debtor's manufacturing operations.

| Registered Document | Filing date | Collateral | Lapse Date |
|---|---|---|---|
| UCC Financing Statement (#20200012038-CL1) | 09/01/2020 | 1. Twenty (20) 12 Ton punching machines.<br>2. Twenty (20) 16 Ton punching machines.<br>3. Twenty (20) 25 Ton punching machines | Lapse date extended to 09/02/2030 with UCC3 Financing Statement Amendment (Continuation) filed on 06/19/2025 |
| UCC Financing Statement (#20200016729-CL2) | 10/05/2020 | 1. 2520 Semi Auto Glass cutting machine<br>2. Double Edging Polishing Lineup<br>3. 1200 Horizontal Glass Washing Machine<br>4. Four Motor Single Pencil Edging Machine<br>5. Spare Cutters<br>6. Ocean Freight of 40' Container | Lapse date extended to 10/06/2030 with UCC3 Financing Statement Amendment (Continuation) filed on 06/19/2025 |
| UCC – Financing Statement (#20210003255-CL3) | 02/26/2021 | 1. Two (2) 2019 Linde HT25T Internal Combustion LPG Forklift Truck | 02/26/2026 |
| UCC Financing Statement (#20210003646-CL4) | 03/10/2021 | 1. 2021 Chicago Rivet Model 173 Four Head Machine Air Operated | 03/10/2026 |

It is also important to note that all the UCC Financing Agreements filed for the Schedules

to the Master Lease Agreement state that the collateral "includes but is not limited to" the

equipment described in the document. Also, the UCC Financing Statements state that the

collateral includes "all present and future attachments, accessories, replacement parts, repairs and

additions or substitutions" as part of the description of the collateral that secure the loans. Therefore, the purpose of the Cross Collateral Agreements is not to include new collateral to secure the Loans entered into under the Master Lease Agreement. Rather, Debtor signed them to enhance the security interest of all of the loans signed under the Master Lease Agreement, with properly described collateral in their UCC Financing Statements. As per the Cross Collateral Agreement the collateral described in the UCC Financing Statements filed in connection with loans CL1 and CL2 serve as collateral for subsequent liabilities of Debtor to CEFI. The security interest was properly perfected with the filing of the UCC Financing Statement in the Puerto Rico State Department and the publicity requirement was met.

      **(iii)**     **Whether the Cross Collateral Agreements had to be registered in the Puerto Rico Department of State to be enforceable against Debtor and third parties.**

Debtor argues that CEFI's failure to amend or file a new UCC Financing Statement to include additional collateral pursuant to the Cross Collateral Agreements renders POC #2-2 as unsecured. We are therefore tasked to determine if the collateral that secures the other loans under the Master Lease Agreement secure Loan CL4, even though the Cross Collateral Agreements were not registered in the Puerto Rico Department of State.

Section 2234(a) of the Commercial Transactions Act of Puerto Rico, P.R. Laws. Ann. tit. 19 § 2234, states the following regarding after-acquired collateral: "[e]xcept as otherwise provided in subsection (b) of this section, a security agreement may create or provide for a security interest in after-acquired collateral." CEFI argues that this legal disposition confirms the validity of cross collateral agreements under Puerto Rico Law and, therefore, confirms the status of amended Claim No. 2 as secured.

CEFI cites Pride Hyundai, Inc. v. Chrysler Fin. Co., L.L.C., 369 F.3d 603 (1st Cir. 2004) as precedent for the enforceability of cross collateral and cross default agreements. The Court in

Pride established that sweeping security provisions, also known as *dragnet clauses*, "purport to secure all of a debtor's obligations to a creditor, regardless of whether those obligations arise prior to, concurrent with, or after the instrument containing the dragnet clause itself." Pride Hyundai, 369 F.3d at 606. The Court in Pride added:

> The parties in transactions involving dragnet clauses are typically sophisticated market actors. Commercial parties on both sides of a transaction may have good reasons to enter into a security agreement that secures not only present liabilities, but also future liabilities of a different class or type. Such an arrangement allows future credit to be extended between the parties on a secured basis without the additional transaction costs that would accompany the execution of a new agreement for each such transaction.

Id., at p. 616.

CEFI also cites Fin. Oversight & Mgmt. Bd. for P.R. v. U.S. Bank N.A. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 121 F.4th 280 (1st Cir. 2024) to exemplify the lack of specific requirements for security interests under Puerto Rico Law. Rather than having a "magic word" requirement for creating a security agreement, under Puerto Rico Law, a security agreement only needs to indicate an objective intent to create a security interest. In re Fin. Oversight & Mgmt. Bd. for P.R., 121 F.4th at 296. The court in In re Fin. Oversight & Mgmt. Bd. for P.R. also concluded that several provisions in Puerto Rico law establish that creditors may hold a security interest in yet-to-be-acquired collateral. Id., at 301.

As illustrated in the table above, following the signing of the Master Lease Agreement, the parties signed Schedule # 2901278-CL1, the final payment of which was due on November 1, 2024. (Dkt. # 171, Exh. 3). As illustrated in the previous table, UCC Financing Statement #20200012038 describes sixty (60) punching machines of different capacities as collateral for Loan CL1. It is important to note that UCC Financing Statement #20200012038 was filed on September 1, 2020, with an original lapse date of September 1, 2025, ten months after the date of

the final payment for Loan CL1. (Dkt. # 171, Exh. 4). The Parties signed a Cross Collateral

Agreement for Loan CL1 on September 1, 2020. (Dkt. # 171, Exh. 8). Accordingly, and although

CL1 had been fully paid, on June 19, 2025, the lapse date for the UCC Financing Statement

#20200012038 was extended through September 2, 2030. (Dkt. # 171, Exh. 5).

On October 5, 2020, the Parties signed Schedule #20202901278-CL2, whose final

payment was also due on November 1, 2024. As illustrated in the previous table, UCC Financing

Statement #20200016729 describes a semi auto glass cutting machine, a double edging polishing

line up machine, a horizontal glass washing machine, a four-motor single pencil edging machine,

135 units of spare cutters and a 40' ocean freight container as collateral for Loan CL2. (Dkt. #

171, Exh. 6). UCC Financing Statement #20200016729, was filed on October 5, 2020, with an

original lapse date of October 5, 2025. (Dkt. # 171, Exh. 6). As with the UCC Financing

Statement related to Loan CL1, the Parties signed a Cross Collateral Agreement for Loan CL2 on

October 5, 2020. (Dkt. # 95, Exh. 6). On June 19, 2025, the lapse date for UCC Financing

Statement #2020016729 was also extended through October 6, 2030. (Dkt. # 171, Exh. 7).

CEFI did not file claims for Loans CL1 and CL2 because they were paid in full pre-

petition, but the Cross Collateral Agreements render all loans entered into under the Master

Lease Agreement secured by their collateral until September 2, 2030 (for the collateral described

for Loan CL1) and October 6, 2030 (for the collateral described for Loan CL2). The terms of the

Cross Collateral Agreements signed for Loan CL1 and Loan CL2 (under which the Parties

agreed that CEFI would retain security interest in all collateral covered by all loans as security

for payment and performance of all accounts, notwithstanding the fact that one or more of such

accounts was fully paid), along with the amendments to the UCC Financing Agreements that

describe the collateral that secured Loan CL1 and Loan CL2, brings us to the inevitable

15

conclusion that all loans subscribed under the Master Lease Agreement, including Loan CL4, are currently secured with the equipment that served as collateral for Loan CL1 and Loan CL2.

Debtor failed to present any legal references or jurisprudence to support its argument that the Cross Collateral Agreements needed to be registered in the Puerto Rico Department of State to be binding between the Parties or enforceable against third parties. In fact, it is unclear if this is possible. Also, Debtor failed to substantiate its argument that the UCC Financing Statement for CL4 needed to be amended to include the equipment listed in the prior UCC Financing Statements for it to serve as collateral for this loan. The agreement between the Parties clearly provides that such amendment was unnecessary, the security had been perfected and responded for all future liabilities.

Therefore, we find that amended Claim No. 2 is secured by the equipment that secured Loan CL1 and Loan CL2.

## VI. CONCLUSION

For the reasons stated above, the Objection to Proof of Claim # 2-2 filed by Debtor (Dkt. # 117) is hereby denied.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 9th day of October 2025.

María de los Ángeles González
United States Bankruptcy Judge

16